FILED

2011 Sep-21  PM 02:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| H E R M I T A G E   I N S U R A N C E COMPANY, | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| DIAZ ROOFING, L.L.C.; B.J. BLANCHARD; SUSAN BLANCHARD; STEVE SHIRLEY; STEVE SHIRLEY, INC., | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| **Defendants.** | ) |

**Case Number 2:10-CV-2225-SLB**

### MEMORANDUM OPINION

This case is presently pending before the court on Motion for Default Judgment, (doc. 22),[1] and Motion for Summary Judgment, (doc. 29), filed by plaintiff Hermitage Insurance Company.  Hermitage filed this case seeking a declaratory judgment that it had no duty to defend or indemnify defendant Diaz Roofing and/or defendants Steve Shirley and Steve Shirley, Inc., against the Blanchards' claims and the cross-claims of the Shirley Defendants asserted in an action now pending in the Circuit Court of Shelby County, Alabama.  (Doc. 1 ¶¶ 2, 18.)  Upon consideration of the record, the submissions of the parties, the arguments

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record. Page numbers refer to those reflected in the header of the court's CM/ECF electronic filing system, not the numbers printed on the bottom of the pages of the hard copy of defendants' Motion.

of counsel, and the relevant law, the court is of the opinion that Motion for Default Judgment

is due to be denied and the Motion for Summary Judgment is due to be granted.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d

604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once

the moving party has met its burden, the non-moving party must go beyond the pleadings and

show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett,* 477 U.S.

317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support
> the assertion by:
>
> > (A)  citing to particular parts of materials in the record, including
> > depositions, documents, electronically stored information, affidavits or
> > declarations, stipulations (including those made for purposes of the
> > motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B)  showing that the materials cited do not establish the absence or
> > presence of a genuine dispute, or that an adverse party cannot produce
> > admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state

that the non-moving party cannot meet its burden at trial").

2

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655(1962) (per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II. <u>STATEMENT OF FACTS</u>[2]

In January 2006, defendants B.J. and Susan Blanchard contracted with defendants Steve Shirley and Steve Shirley, Inc., for the construction of a new home. (Doc. 29-1 at 4, 117.)[3] The Shirley Defendants hired defendant Diaz Roofing, L.L.C., to install a tile roof on

---

[2]As required when determining a Motion for Summary Judgment, the court has construed the facts in the light most favorable to defendants, the non-moving parties. All disputed facts are resolved in their favor, and all reasonable inferences arising from those facts are drawn in their favor. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990); *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455 (11th Cir,. 1997).

[3]Although plaintiff cites to specific exhibits submitted in support of its Motion for Summary Judgment, it actually filed all its evidence as one attachment to its Motion. The

the Blanchards' home.  (*Id*. at 99.)  The Shirley Defendants and Diaz Roofing did not have

a written contract, although they had a written estimate.  (*Id*. at 127-31.)

> According to Marco Diaz, President of Diaz Roofing,
>
> [I]n October 2007, Diaz was notified by Steve Shirley regarding a leak in the [Blanchards'] roof on the first level of the . . . roof over the [Blanchards'] bedroom.  In November 2007, Diaz was [informed] by Steve Shirley regarding a leak in the chimney.  In December 2007, Diaz was notified by Steve Shirley regarding a leak in the ridge of the roof covering the attic over the Blanchards' exercise room.  All of these complaints [about] alleged leaks occurred and were corrected during the construction phase of the Blanchards' home. Diaz was not notified again about any complaints regarding the Blanchards' home until Steve Shirley notified Diaz immediately prior to the Blanchards' instigating formal legal proceedings against Diaz Roofing, LLC in May 2009.

(Doc. 29-1 at 80, 85.)  Mr. Diaz testified that he finished working on the Blanchards' roof

in 2007.  (Doc. 29-1 at 90, 93.)  As of October 2007, the tile was on the roof.  (*Id* at 97.)

> The Blanchards moved into the house in late May 2008.  (Doc. 32-2 at 68.)  They

noticed new roof leaks in June and July 2008, and they noticed cracked tiles in July 2008.

(*See* doc. 34-4 at 2; doc. 34-2 at 230-31.)  The leaks found in 2008 were in areas different

from the areas of the 2007 leaks. (Doc. 34-2 at 229.)  According to Mr. Blanchard, the

Shirley Defendants told him that they contacted Diaz Roofing and asked it to fix the roof

problems.  (*Id*. at 243-44.)  Mr. Blanchard could not testify whether Diaz Roofing had come

to fix the roof.  (*Id*. at 244.)  In August 2008, Mr. Blanchard complained that the roof tiles

---

court has converted the parties' citations to plaintiff's individual exhibits to the document and page number assigned by the court's CM/ECF electronic filing system.  Thus, plaintiff's citation paragraph 9 of Exhibit A to its Motion for Summary Judgment is cited as "Doc. 29-1 at 4."

were sliding off the roof and exposing the ice shield.  (*Id*. at 245.)  In response to an

interrogatory, Mr. Blanchard testified:

> During the construction stage and while I was visiting the construction
> site, I . . . walked around the back porch off of the master bedroom and noticed
> water running down the inside of the outside wall onto the concrete porch.  I
> immediately went to get and to meet with Shirley about the leak and he said
> that there was no way that the roof was leaking.  Shirley and I went through
> the garage and into the attic over the master bedroom.  I showed Shirley where
> the water was leaking into the wall from the roof.  Instead of admitting the
> obvious, that multiple leaks existed causing damage to the interior walls,
> insulation and plywood, Shirley denied that any leaks were present.  Even after
> seeing the undisputed evidence of the wet interior walls and that water was
> entering through the attic, Shirley argued that he would fix the leak only if the
> bedroom wall and insulation were wet, which they were.  Still refusing to
> admit the obvious, Shirley said that he would try to repair the wall; however,
> he never provided any record of what was done or if the costs were added to
> the amount paid by us.  Because of the leaks, the sheetrock and insulation in
> the bedroom wall needed to be replaced and no record was ever provided
> regarding the work performed or the costs incurred and whether Shirley
> provided a credit for damages incurred.  In addition, Shirley provided no
> record to show if he or Diaz Roofing, LLC . . . ever tried to fix the improper
> installation of the roof that caused the leak.
>
> After we moved in the house, we found three . . . more leaks in the
> attic/roof as well as cracked roof tiles which I . . . reported to Shirley.
> Although Shirley claimed to have properly repaired the leaks, he did not
> replace the cracked tiles and allowed Diaz to use blue glue that did not match
> the tiles or the grout on the roof.  Shirley and Diaz failed to replace the cracked
> tiles even though extra tiles existed as a result of Shirley's over-ordering of
> product to run up construction costs.  In addition, after we moved into the
> house, we hired a gutter company to install copper gutters because Shirley and
> Diaz were not capable of properly installing the flashing and gutters.  During
> construction, a representative of B&B Seamless Gutters and Windows
> Replacement . . . informed me . . . that Shirley told them if they found anything
> wrong with the roof for them not to tell us.  In addition, B&B told us that
> Shirley and Diaz had used unacceptable materials causing additional damage
> to the house.

After inspection by B&B, we were told that any flashing installed by Shirley and Diaz had to be replaced as soon as possible because of the shoddy workmanship causing damage to our home.  In addition, a representative of B&B informed us about the cracking tiles on the roof that had been glued rather than replaced.  He also stated that gluing cracked tiles on a new house was not a proper repair and [the tiles] needed to be replaced.

Three months after we moved in the house, I . . . noticed a 3" X 12" hole under a vent above the two-car garage that had not been sealed.  I called Shirley and he called Diaz.  After a week went by and they represented that they had fixed it, I inspected the area and noticed that a gray cement color (which did not match the color of the roof cement) was installed in a very sloppy manner and was nowhere near the color of the cement used on all the other vents on the roof.  I called Shirley and he said that Diaz had fixed the 3" x 12" hole properly and that he was not going to do anything else about it.  Shirley never came to inspect Diaz's work and assumed that we would just take the improper repair as being good enough.  As a result, we had to tell him what Diaz had done and ask that he require Diaz to come back and try to make a proper repair.  Although Shirley failed to inspect the property, he continually requested draws for construction even though he failed to supervise the work and failed to ensure that it was performed properly.

We noticed additional or ongoing leaks in the attic over the three-car garage, sitting room and master bedroom and bathroom.  I . . . went into my attic on October 7, 2009 after hearing a dripping noise above my bed in the master bedroom.  I noticed a wet spot in the attic near the area where problems and leaks were noted over the master bedroom during the construction phase. . . .  In addition, another leak was found near an air duct in the attic over the sitting room that was also noted during the construction phase.  On the same day, another leak was found underneath the valley in the roof that runs toward the side of my house over the bathroom off of the master bedroom.  The problems with the roof over the master bedroom were discussed with Shirley during the construction phase and he failed to correct them.

(Doc. 34-1 at 5-7.)  The Blanchards also testified that they have lost "sleep, have headaches and consistently worry about the condition of their home."  (*Id*. at 12.)  Mr. Blanchard testified that the roof was never installed properly.  (Doc. 34-2 at 319-20.)

Plaintiff Hermitage Insurance Company issued a commercial general liability [CGL] policy, policy number HGL 54305708, to Diaz Roofing. (*See* doc. 1-1 at 5.) The policy period was May 20, 2008 to May 20, 2009, but Hermitage cancelled the policy effective October 20, 2008. (*See id*. at 2.) The policy provides:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.
>
> . . .
>
> b. This insurance applies to "bodily injury" and "property damage" only if:
>
>> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory",
>>
>> (2) The "bodily injury" or "property damage" occurs during the policy period; and
>>
>> (3) Prior to the policy period, no insured . . . and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.
>
> c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred . . . includes any continuation, change, or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d.  "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured . . . or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1)  Reports all, or any part of the "bodily injury" or "property damage" to us or any other insurer;

(2)  Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3)  Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

(Doc. 1-1 at 8.)  The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (*Id*. at 21.) Moreover, the definition of "insured" "include[s] as an additional insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy."  (*Id*. at 24.)

On May 26, 2009, the Blanchards filed suit against the Shirley Defendants and Diaz Roofing in the Circuit Court of Shelby County, alleging negligence/wantonness, breach of contract, fraud/misrepresentation/suppression, unjust enrichment, breach of warranty, breach of implied warranty of habitability, conspiracy, accounting, and negligent hiring/training/supervision.  (*See* doc. 1-1 at 54, 60-63.)  In their First Amended Complaint, the Blanchards have alleged:

9.  Plaintiffs own a lot located [on] Greystone Crest [in] Birmingham, Alabama . . . .  In or around January 2006, Plaintiffs entered into a contract .

8

. . with Defendants Steve Shirley and Steve Shirley, Inc. . . . . for the purpose of having the Shirley Defendants construct a house [on their lot].

10.   Diaz Roofing, LLC was hired to install the roof on the House.

11.   Even though the Contract with the Shirley Defendants provided for a cost of construction of approximately $3 million, Plaintiffs were required to pay in excess of $6 million.  The Contract provided for a "costs plus" payment to the Shirley Defendants of 13% of all actual cost involved in the construction of the dwelling and improvements."

. . .

13.   After signing the Contract, Plaintiffs asked the Shirley Defendants on multiple occasions about construction issues with House including, but not limited to . . . leaks in the windows, roofs, and exterior and interior walls.  The Shirley Defendants represented to the Plaintiffs that these issues would be fixed.  Plaintiffs relied on these representations and were induced to allow the Shirley Defendants to continue to perform work on their House based on these representations.  As Plaintiffs later learned, each of these representations was false, and Plaintiffs were damaged as a result.

14.   In addition, Plaintiffs asked the Shirley Defendants on multiple occasions about cost overruns and delays in construction.   The Shirley Defendants represented to the Plaintiffs that these issues would be corrected and that the Plaintiffs would not incur additional cost overruns or construction delays.  Plaintiffs relief on these representations and were induced to allow the Shirley Defendants to continue to perform work on their House based on these representations by the Shirley Defendants.  As Plaintiffs later learned, each of these representations was false, and Plaintiffs were damaged as a result.

. . .

16.   After moving into the House, the Plaintiffs began noticing problems with the House.  The House contained significant construction defects, deficiencies, and problem areas including, but not limited to, . . . multiple water leaks both on interior and exterior walls from water intrusion from the roof, windows, and exterior finishing; leakage and improper draining underneath the laid roof tile;  . . . water entry into multiple areas including, but not limited to, the storage area under the exterior stairs, attic over three-car

garage and master bedroom, media room, hallway and kitchen; damage to the electrical system in the breezeway; . . . cracking in the ceiling and woodwork throughout the House; cracked and defective tiles on the roof; and numerous other problems and defects.

17.   The Shirley Defendants have failed to repair, replace or otherwise correct the problem areas.  Plaintiffs have complied with the notice terms of the warranty and have allowed an inspection of the House concerning the construction defects, deficiencies, and problems the Plaintiffs have incurred with the House.

18.   Despite the Plaintiffs' timely payments, the Defendants did not comply with the terms of the Contract.  Specifically, . . . the construction of the House was faulty in numerous respects.  In fact, the work performed by the Defendants was so poorly done that the Plaintiffs were forced to hire an independent engineer and other consultants to determine what repairs are required.  The engineers and consultants who have inspected the House have all concluded that the House was not built according to applicable building codes and requirements and that there were numerous defects in the House.

19.   Plaintiff were also forced to incur additional costs to hire other consultants to review Defendants' work and identify additional flaws in the construction of the House.  To date, Defendants still have not adequately repaired the defects and problems identified by Plaintiffs' engineer, inspector and consultants.

20.  Because of the problems discussed above, among others, Plaintiffs were forced to hire a construction company to install flashing to the roof.

21.  Plaintiffs have incurred and will continue to incur substantial costs to attempt to repair the defects, deficiencies and problems caused by the Defendants.

22.   As a result of Defendants' conduct, Plaintiffs have suffered damages, including but not limited to, additional costs to complete the construction of the house, costs to hire [an] engineer and other consultants, attorneys' fees to prosecute this lawsuit, diminution of the value of the House, payments to Defendants for work not performed or performed by others, payments to the Shirley Defendants for a profit markup for work and services never performed or performed by others, payments to the Shirley Defendants

for a profit markup for costs and expenses that were not actually incurred, and damages for mental anguish and emotional distress.

(Doc. 32-1 at 5-9.)  Mr. Blanchard testified, "[W]e are suing Diaz [Roofing] for very poor installation of our roof," and "[T]he roof is falling apart strictly because of poor workmanship from the roofer.  It's quite evident that it was the roofer's fault."  (Doc. 34-2 at 334, 338.)

Hermitage received notice of the lawsuit on June 29, 2009, from the Shirley Defendants' attorney.  (Doc. 29-1 at 89.)  Hermitage never received notice from Diaz Roofing.

On July 7, 2009, the Shirley Defendants filed a cross claim against Diaz Roofing, alleging (1) breach of contract; (2) breach of implied warranty; (3) negligence; and (4) common-law indemnity.  (*See generally* doc. 32-4.)

Hermitage filed the instant declaratory judgment action while the Blanchards' case was proceeding in the state court.  In its Complaint, Hermitage notes the following disputes have arisen for which it seeks resolution:

> 12.  Currently, Hermitage is defending Diaz under a reservation of rights.  However, a dispute has arisen between Hermitage and Diaz as to whether there was an "occurrence," as defined by the policy, in this case.  There is also a dispute as to whether, if there was an "occurrence," the alleged "occurrence" happened during the insurance policy period.

> 13.  A dispute has also arisen as to whether Diaz gave Hermitage late notice of the alleged "occurrence," which would violate the terms of the insurance policy.

11

14.   There also is a dispute as to whether Diaz made material misrepresentations after the loss, which would be a violation of the terms of the insurance policy.

15.   Also, the Complaint seeks damages for claims not covered by the policy, specifically property damage to the insured's work and/or product and the cost to replace, restore or repair the insured's work and/or product.

(Doc. 1 ¶¶ 12-17.)  Hermitage asks the court to declare that it does not owe Diaz Roofing and/or the Shirley Defendants a defense or indemnity under the policy issued to Diaz Roofing.  (*Id.* ¶ 18 (d)-(f).[4]

### III. <u>DISCUSSION</u>

Hermitage has filed this suit asking the court to determine whether it has a duty to defend and/or indemnify Diaz Roofing and the Shirley Defendants against the Blanchards' claims in state court.  This court has diversity subject-matter jurisdiction.  "A federal court in a diversity case is required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits." *Colonial Life & Acc. Ins. Co. v. Hartford Fire Ins. Co.*, 358 F.3d 1306, 1308 (11th Cir. 2004)(quoting *O'Neal v. Kennamer*, 958 F.2d 1044, 1046 (11th Cir. 1992)).

"Alabama law holds that the law of the state where the insurance policy was delivered to the insured controls the interpretation of the insurance contract." *Travelers Indem. Co. v. General Star Indem. Co.*, 157 F. Supp. 2d 1273, 1285 (S.D. Ala. 2001)(citing *Ferris v.*

---

[4]The court has stayed determination of whether Hermitage has a duty to indemnify until the state court finds liability or this court finds no duty to defend.  (Doc. 21.)

*Jennings*, 851 F. Supp. 418, 421-22 (M.D. Ala. 1993); *Ailey v. Nationwide Mutual Ins. Co.*, 570 So. 2d 598 (Ala. 1990)).  It appears that the policy was delivered to Diaz Roofing in Alabama, (*see* doc. 1-1 at 5); therefore, Alabama law applies to the interpretation of the terms of the policy.  "In Alabama, the interpretation of a contract, including an insurance contract, is a question of law . . . ." *Twin City Fire Ins. Co., Inc. v. Ohio Cas. Ins. Co., Inc.*, 480 F.3d 1254, 1258 (11th Cir. 2007)(citing *Royal Ins. Co. of Am. v. Whitaker Contracting Corp.*, 242 F.3d 1035, 1040 (11th Cir. 2001)), *quoted in HR Acquisition I Corp. v. Twin City Fire Ins, Co.*, 547 F.3d 1309, 1314 (11th Cir. 2008).  "Under Alabama law, general rules of contract law govern an insurance contract.  The court must enforce the insurance policy as written if the terms are unambiguous." *HR Acquisition I Corp.*, 547 F.3d at 1314 (quoting *Lambert v. Coregis Ins. Co., Inc.*, 950 So. 2d 1156, 1161 (Ala. 2006)(quoting *Safeway Ins. Co. of Ala. v. Herrera*, 912 So. 2d 1140, 1143 (Ala.2005)))(internal quotations omitted).

## A.  DIAZ ROOFING

In Alabama –

It is well settled "that [an] insurer's duty to defend is more extensive than its duty to [indemnify]."  *United States Fid. & Guar. Co. v. Armstrong*, 479 So. 2d 1164, 1168 (Ala. 1985)(citations omitted).  Whether an insurance company owes its insured a duty to provide a defense in proceedings instituted against the insured is determined primarily by the allegations contained in the complaint.  *Id*. at 1168.  ***If the allegations of the injured party's complaint show an accident or occurrence within the coverage of the policy, then the insurer is obligated to defend***, regardless of the ultimate liability of the insured.  *Ladner & Co. v. Southern Guar. Ins. Co.*, 347 So. 2d 100, 102 (Ala. 1977) (citing *Goldberg v. Lumber Mut. Cas. Ins. Co.*, 297 N.Y. 148, 77 N.E.

2d 131 (1948)).  However, "[t]his Court . . . has rejected the argument that the insurer's obligation to defend must be determined solely from the facts alleged in the complaint in the action against the insured."  *Ladner*, 347 So. 2d at 103.  In *Pacific Indemnity Co. v. Run-A-Ford Co.*, 276 Ala. 311, 161 So. 2d 789 (1964), this Court explained:

> "We are of opinion that in deciding whether a complaint alleges such injury, the court is not limited to the bare allegations of the complaint in the action against insured but may also look to facts which may be proved by admissible evidence . . . ."

276 Ala. at 318, 161 So. 2d at 795; see *Ladner*, 347 So. 2d at 103 (quoting this language).  "[I]f there is any uncertainty as to whether the complaint alleges facts that would invoke the duty to defend, the insurer must investigate the facts surrounding the incident that gave rise to the complaint in order to determine whether it has a duty to defend the insured."  *Blackburn v. Fidelity & Deposit Co. of Maryland*, 667 So. 2d 661, 668 (Ala.1995)(citing *United States Fid. & Guar. Co. v. Armstrong*, 479 So. 2d 1164 (Ala.1985))(other citations omitted).  When a complaint alleges both acts covered under the policy and acts not covered, the insurer is under a duty to at least defend the allegations covered by the policy.  *Blackburn*, 667 So. 2d at 670 (citing *Tapscott v. Allstate Ins. Co.*, 526 So. 2d 570, 574 (Ala.1988)).

*Acceptance Ins. Co. v. Brown*, 832 So. 2d 1, 14 (Ala. 2001)(emphasis added), *quoted in part in Great American Ins. Co. v. Baddley and Mauro, LLC*, 330 Fed. Appx. 174, 177 (11th Cir. 2009)("Under Alabama law, the court can determine whether an insurance company owes its insured a duty to provide a defense in proceedings instituted against the insured by the allegations contained in the complaint.  When any 'uncertainty' exists about whether the occurrence is covered under the policy, the court is not limited to the bare allegations of the complaint in the action against the insured but may look to facts which may be proved by admissible evidence.")(internal citations and quotations omitted).  Also,

14

> [When] facts are alleged in the complaint to support a cause of action,
> it is the facts, not the legal phraseology, that determine whether an insurer has
> a duty to defend its insured in the action.  As we have said: "[I]f there is any
> uncertainty as to whether the complaint alleges *facts* that would invoke the
> duty to defend, the insurer must investigate the *facts* surrounding the incident
> . . . to determine whether it has a duty to defend . . . ."  *Acceptance Ins. Co. v.
> Brown*, 832 So. 2d at 14 (quoting *Blackburn v. Fidelity & Deposit Co. of
> Maryland*, 667 So. 2d 661, 668 (Ala. 1995))(emphasis added); *see also
> McCauley v. Estes*, 726 So. 2d 719 (Ala. Civ. App.1998).

*Hartford Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So. 2d 1006, 1012 (Ala. 2005).

Therefore, in this case the court's –

> analysis of whether [Hermitage] has a duty to supply a defense for [Diaz
> Roofing] in [the Blanchards'] action against [Diaz Roofing] is two-pronged.
> First [it] must determine whether the facts alleged in [the Blanchards']
> complaint state an "occurrence" within the meaning of the policy.  Secondly,
> and presupposing a negative answer to the first inquiry, we must determine
> whether the "facts which may be proved by admissible evidence" state an
> "occurrence."

*Id*. at 1011 (citing *Pacific Indem. Co. v. Run-A-Ford Co.*, 161 So. 2d 789, 795 (1964)).

Hermitage argues, because the roof began to leak in 2007 and its policy insuring Diaz

became effective May 20, 2008, there was no occurrence during the policy period.[5]  In

Alabama, the date of an "occurrence" is the date property damage or bodily injury is suffered.

> The law provides that the insurance carrier with the policy in effect at
> the time of damage is responsible for the defense and indemnity of the insured.
> *United States Fidelity & Guaranty Co. v. Warwick Dev. Co.*, 446 So. 2d 1021

---

[5]Plaintiff contends that there was no "occurrence" as defined by the policy, but assuming there was an occurrence, the date of the "occurrence" was before plaintiff's insurance policy was in force and effect.  Plaintiff notes that "[i]nstead of doing battle over whether faulty construction is, in fact and law, an "occurrence", . . . [plaintiff] will focus on the date of the alleged "occurrence" because that issue is dispositive." (Doc. 29-1 at 17, n.3)

> (Ala. 1984).  In *Warwick*, this Court stated that "it is the insurance that is in force at the time of the *property damage* that is applicable rather than insurance that was in force when the work was performed."  446 So. 2d at 1024 (emphasis added).  Similarly, in *Utica Mutual Ins. Co. v. Tuscaloosa Motor Co.*, 295 Ala. 309, 329 So. 2d 82 (1976), this Court stated that coverage under a policy of insurance is afforded only when "*loss of* property is suffered during the policy period irrespective of when the negligent act was performed."  295 Ala. at 313, 329 So. 2d at 85.  (Emphasis original.)

*Mutual Fire, Marine and Inland Ins. Co. v. Safeco Ins. Co.*, 473 So. 2d 1012, 1014 (Ala. 1985).  The policy at issue in this case defines "occurrence" to include "continuous or repeated exposure to substantially the same general harmful condition."  (Doc. 1-1 at 33.) Whether there is single occurrence or multiple occurrences, however, depends of the proximate cause of any injury or injuries and not of the number of injuries.  The Alabama Supreme Court has held:

> In *United States Fire Insurance Co. v. Safeco Insurance Co.*, 444 So. 2d 844 (Ala.1983), the Alabama Supreme Court addressed the meaning of the term "occurrence" for purposes of determining the deductible due from the insured. In that case, the Court concluded that a single occurrence encompassed all the damage proximately resulting from each incident.  The *United States Fire Insurance* Court stated that, under Alabama law, " ' [a]s long as the injuries stem from *one* proximate cause there is a *single* occurrence,' " 444 So. 2d at 846 (quoting *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir.1982)); however, "'if the cause is interrupted or replaced by another cause, the chain of causation is broken and more than one accident or occurrence has taken place.'"  444 So. 2d at 847 (quoting 8A Long, *Insurance Law and Practice* § 4891.25 at 18 (1981)).

*St. Paul Fire & Marine Ins. Co. v. Christiansen Marine, Inc.*, 893 So. 2d 1124, 1137 (Ala. 2004).

The Blanchards' First Amended Complaint contains little factual detail of their claims against Diaz Roofing.  They allege, "Diaz Roofing was hired to install the roof on the House."  (Doc. 32-1 ¶ 10.)  Also, they allege that they and the Shirley Defendants had entered into a contract for the construction of the house in January 2006.  (Doc. 32-1 ¶ 9.)  After signing the contract, the Blanchards asked the Shirley Defendants about leaks in the roof, among other issues.  (*Id*. ¶ 13.)  After moving into the house, the Blanchards noticed leaks in the roof and cracked or missing roof tiles.  (*Id*. ¶ 16.)  These facts do not set forth the date the Blanchards first discovered any damage or injury incurred as a result of work performed by Diaz Roofing.  Therefore, the court finds that the Amended Complaint does not "state an 'occurrence' within the meaning of the policy."  *Merchants and Farmers Bank*, 928 So. 2d at 1011.

Because the First Amended Complaint does not state an occurrence, the court has considered "facts which may be proved by admissible evidence" to determine whether the Blanchards' claims flow from an occurrence or occurrences covered by the Hermitage policy.  The undisputed evidence shows that the Blanchards noted that their roof was leaking in October 2007.  (Doc. 29 at 8-9; *see generally* docs. 31 and 33 [neither the Shirley Defendants nor the Blanchards dispute Hermitage's assertion that the roof leaks were first noted in October 2007].)  The Blanchards argue that Diaz Roofing performed some remedial work after the roof was installed sometime in 2007.  (*See* doc. 33 at 5-6 [citing doc. 34-2 at 229-30, 243-44; doc. 34-4].)  However, the evidence cited in support of this assertion is not

admissible to prove that Diaz Roofing performed any work after the roof was installed.  (*See* doc. 34-2 at 229-30 [nothing on these pages refers to any work by Diaz Roofing]; *id*. at 243-44 [Mr. Blanchard testified that Mr. Shirley "attempted to bring Mr. Diaz out and fix some leaks;" but, when asked if Mr. Diaz had actually worked on the roof, Mr. Blanchard replied only that "someone" had come to work on the roof]; doc. 34-3 [nothing in the time-line created by the Blanchards indicates that Diaz Roofing performed any work on the roof after the Blanchards moved into the house].)  No admissible evidence has been presented that Diaz Roofing worked on the Blanchards' house after he installed the roof in 2007 or, if he did, that any work after May 2008 caused some or all of the problems of which the Blanchards complain.

The Blanchards argue, "The 2008 leaks and the current leaks are not all in the same location as the 2007 leaks.  Additional leaks and damages were noticed during the policy period and Diaz performed work at the Blanchard residence during the admitted policy period; therefore, Hermitage's Motion for Summary Judgment is due to be denied in its entirety."  (Doc. 33 at 9.)  The Shirley Defendants argue that the Blanchards experienced bodily injury – mental anguish – only after they moved into the house; therefore, their claims alleging bodily injury occurred during the policy period.[6]  However, the policy does not cover

---

[6]The Shirley Defendants also allege that plaintiffs' "innocent fraud claim" against Diaz Roofing occurred during the policy period.  (Doc. 31 at 15 n.2.)  The Amended Complaint does not allege a fraud or misrepresentation claim against Diaz Roofing as it contains no allegation that Diaz Roofing made any representation to the Blanchards. Moreover, Mr. Blanchard testified that he never had any discussion or communication with

individual incidences of bodily injury or property damage; rather the policy covers bodily injuries and property damages caused by an occurrence during the policy period.  (Doc. 1-1 at 8.)  An occurrence includes "continuous or repeated exposure to substantially the same general harmful conditions," like a poorly installed roof that continually leaks.

In *Appalachian Insurance Company*, as quoted in *U.S. Fire Insurance* by the Alabama Supreme Court, the Third Circuit Court of Appeals noted:

> The general rule is that an occurrence is determined by the cause or causes of the resulting injury. . . .  Using this analysis, the court asks if there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage.
>
> . . .
>
> The fact that there were multiple injuries and that they were of different magnitudes and that injuries extended over a period of time does not alter our conclusion that there was a single occurrence.  As long as the injuries stem from one proximate cause there is a single occurrence.  Indeed, the definition of the term "occurrence" in the Appalachian policy contemplates that one occurrence may have multiple and disparate impacts on individuals and that injuries may extend over a period of time.

*Appalachian Ins. Co. v. Liberty Mut. Ins. Co.,* 676 F.2d 56, 61 (3d Cir. 1982), *quoted in United States Fire Ins. Co. v. Safeco Ins. Co.*, 444 So. 2d 844, 846 (Ala. 1983).  In this case, the court finds, "When the property damage began vis-a-vis the roof leaks, there was an occurrence under [the Hermitage] policy.  *United States Fidelity and Guar. Co. v. Bonitz Insulation Co. of Alabama*, 424 So.2d 569, 571 (Ala. 1982).

-----

Mr. Diaz until after the lawsuit was filed.  (*See* doc. 34-2 at 215-16.) The finds the Blanchards have not asserted a claim based on misrepresentation against Diaz Roofing.

19

According to the Blanchards, this leak was caused by poor workmanship by Diaz Roofing during the installation of the roof.  The record indicates that the first leaks in the roof of the Blanchards' new house were discovered in 2007, before the Blanchards occupied the house and before the Hermitage policy was effective.  Although they reported new leaks in different places throughout his home as well as other problems regarding broken tile and an improperly installed roof vent, Mr. Blanchard testified that ***all*** the problems with his roof – the source of all the Blanchards' claims against Diaz Roofing for property damage and mental anguish – are "strictly" because of poor workmanship in the ***installation*** of the roof. (Doc. 34-2 at 338.)  The damage caused by poor workmanship in the installation of the roof was first reported to Diaz in October of 2007; all subsequent injuries – property damage and/or mental anguish – arose from this same proximate cause – the poor workmanship in the installation of the roof.

Based on the foregoing, the court finds defendants have not shown a disputed issue of fact as to the date of the occurrence, the date the first injury was discovered, or that the cause  of the subsequent leaks and resulting injuries was something other than Diaz's poor workmanship in the installation of the roof – the cause of the first injury in October 2007. The Hermitage policy does not cover the October 2007 occurrence, which is prior to the

20

policy period.[7] (*See* doc. 1-1 at 8.)  Thus, Hermitage has no duty to defend and/or indemnify Diaz Roofing.

Hermitage's Motion for summary judgment will be granted.

As the court has found no coverage for the Blanchards' claims, the court pretermits discussion of the remaining issues relating to Hermitage's duty to defend and/or duty to indemnify Diaz Roofing against the Blanchard's claims.

## B. SHIRLEY DEFENDANTS

The Shirley Defendants contend that Hermitage owes them a duty to defend and to indemnify them as additional insureds under the policy at issue.  They also contend that their cross claim against Diaz Roofing is a covered claim under the policy.

---

[7]The policy provides:

> This insurance applies to bodily injury and property damages only if:
>
> . . .
>
> Prior to the policy period, no insured . . . knew that the bodily injury or property damage had occurred, in whole or in part.  If such a listed insured . . . knew, prior to the policy period, that the bodily injury or property damage occurred, then any continuation, change or resumption of such bodily injury or property damage during or after the policy period will be deemed to have been known prior to the policy period.

(Doc. 1-1 at 8.)  As Diaz Roofing knew about the leaks in October 2007, this provision also negates any coverage of the continuing or resumed problems with the roof after the policy period began in May 2008.

The policy provides that an "additional insured" under the policy includes "any person or organization for whom [the named insured is] performing operations when [the named insured] and such person or organization have ***agreed in writing*** in a contract or agreement that such person or organization be added as an additional insured on [the named insured's] policy." (Doc. 1-1 at 24.)  The evidence in this case is undisputed that Diaz Roofing and the Shirley Defendants have no such written agreement.  Therefore, the court finds that Hermitage has no duty to defend, and, therefore, no duty to indemnify, Steve Shirley or Steve Shirley, Inc.

The Shirley Defendants contend that "Hermitage owes a defense obligation to Diaz for the homeowners' claims,' because their "cross claim against Diaz is based upon the ***same occurrence*** and damages as the homeowners' claims.  For the same reasons Hermitage owes a defense to Diaz for the homeowners' claim, it also owes at least a defense obligation to Diaz for the Shirleys' cross claim." (Doc. 31 at 20.)  Like the Blanchards' claims, the Shirley Defendants' cross claims against Diaz Roofing arise out of the installation of the roof on the Blanchards' house.  (*See* doc. 32-4 ¶¶ 5, 7, 11-12, 15.)  As set forth above, the installation of the roof – the occurrence that forms the basis of the Blanchards' claims –  happened prior to the coverage period of the Hermitage policy.  Therefore, Hermitage has no duty to defend Diaz Roofing against the Shirley Defendants' cross claims that are based on an occurrence prior to the policy period.

Hermitage's Motion for Summary Judgment will be granted as to these claims.

22

## C.  DEFAULT JUDGMENT

Hermitage filed a Motion for Default Judgment against Diaz Roofing based on Diaz Roofing's failure to answer.  (Doc. 22.)  Hermitage did not seek an Entry of Default prior to filing its Motion for Default Judgment and it did not support its Motion with an affidavit showing proper service and failure to answer.  *See* Fed. R. Civ. P. 55(a).  Therefore, Hermitage's Motion is due to be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and plaintiff is entitled to judgment as a matter of law.  An Order granting plaintiff's Motion for Summary Judgment, (doc. 29), and denying its Motion for Default Judgment, (doc. 22), will be entered contemporaneously with this Memorandum Opinion.

Dated this 21st day of September, 2011.

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE